## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

OUR CHILDREN'S EARTH FOUNDATION,

                  Plaintiff,

     v.

CARGILL, INC. and CARGILL DEICING
TECHNOLOGY,

              Defendants.

-------------------------------------------------------------

Case No. 3:19-cv-01007 (LEK/ML)

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

**JURY TRIAL DEMANDED**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Our Children's Earth Foundation ("OCE") by and through its counsel, hereby

alleges:

## I.

## INTRODUCTION

1.     This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act," "the

Act," or "CWA") and the Resource Conservation Recovery Act, 42 U.S.C. § 6901, *et seq.*

("RCRA") to address and abate Defendants' ongoing and continuous violations of the both acts.

2.     Defendants operate a hard rock salt mine at 191 Portland Point Rd., Lansing, New

York, 14882 (the "Facility").  Defendants are subject to, covered by, and must comply with their

New York State Pollutant Discharge Elimination System ("SPDES") permit No. NY-0101290

(the "Permit") issued by the New York State Department of Environmental Conservation

("DEC"). Defendants have violated the Permit and the CWA by 1) discharging stormwater

associated with industrial activity from unpermitted outfalls, 2) discharging unpermitted waste streams from an outfall designated for stormwater runoff, 3) repeatedly exceeding the numeric effluent limits in the Permit, 4) repeatedly violating the non-numeric effluent limits in the Permit, and 5) discharging salt via aerial deposition to nearby waterbodies without a permit.

3.       Stormwater runoff is one of the most significant sources of water pollution in the nation, comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into Cayuga Lake and other receiving waters in this District.  The State of New York has designated more than 7,000 river miles, 319,000 acres of larger waterbodies, 940 square miles of bays and estuaries, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

4.       Defendants' stormwater discharges contribute to this endemic stormwater pollution problem.  Defendants engage in industrial activities such as the bagging, storage, handling, brine processing, transporting by rail, and trucking of mined rock salt.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby surface waters – in particular, Minnegar Brook, Gulf Creek, and Cayuga Lake.  Minnegar Brook and Gulf Creek are both considerably saltier than other streams in the area as a result – saltier than sea water.  The pollution harms animals living in these waters and

ultimately contaminates Cayuga Lake as well.  Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow these waterbodies a fighting chance to regain their health.

5.      Additionally, through their spilling, depositing, discharging or dumping salt or salt brine, Defendants have contributed to the handling, transportation, and disposal of a solid waste that may present an imminent and substantial endangerment to health or the environment, in violation of RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).  One local study estimates that land near the mine is loaded with about 99 tons of excess salt every year – this harms plants and animals, can damage property, and ultimately ends up as additional salt pollution in Cayuga Lake. Cayuga Lake is a drinking water source for tens of thousands of people.

## II.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

7.      Plaintiff has complied with the notice requirements of Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1) and Section 7002(b)(2)(A) of RCRA, 42 U.S.C. § 6972(b)(2)(A).

8.      On April 25, 2019, Plaintiff provided notice of Defendants' violations of the Act and of RCRA and provided notice of Plaintiff's intention to file suit against Defendants to: Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of DEC, as required by the statutes,

33 U.S.C. § 1365(b)(1)(A) and 42 U.S.C. § 6972(b)(2)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3 and 40 C.F.R. §§ 254.1 to 253.3. A true and correct copy of Plaintiff's notice letter, including attachments, is attached as Exhibit A and is incorporated by reference.

9. More than ninety days have passed since the notice letter was served on Defendants and the state and federal agencies.

10. Neither the United States nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B); RCRA § 7002(b)(2)(B)-(C), 42 U.S.C. § 6972(b)(2)(B)-(C).

11. This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

12. Venue is proper in the Northern District of New York pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

13. Plaintiff OCE is a not-for-profit environmental organization organized under the laws of the state of California, with its principal place of business in Napa, California. OCE advocates on behalf of children, who are most vulnerable to pollution, to enable them to breathe clean air and use clean water. OCE's mission is to promote public awareness of domestic and international human rights issues and environmental impacts through information

dissemination, artistic expression, education projects, and private enforcement of environmental protection statutes. OCE has many members, including a number of members that live in close proximity to Cayuga Lake, which is polluted by discharges from the Defendants' Facility.

14.    OCE's members use and enjoy the waters that Defendants have unlawfully polluted and are unlawfully polluting. OCE's members live near Cayuga Lake, participate in community activities focused around Cayuga Lake, and recreate upon Cayuga Lake and its tributaries. OCE members rely on Cayuga Lake as a source of drinking water. OCE members have visited and will return to Gulf Creek and Minnegar Brook as well. Water quality and the health of animals in Cayuga Lake, Gulf Creek, and Minnegar Brook directly affects the health, recreational, aesthetic, commercial, and environmental interests of OCE's members. The interests of OCE's members are adversely affected by Defendants' failure to comply with the requirements of the Clean Water Act.

15.    The relief sought herein will redress the harms to Plaintiff and its members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

16.    Plaintiff is informed and believes, and thereupon alleges, that Defendant Cargill, Inc. is a corporation incorporated under the laws of the state of Delaware, which is registered as a foreign business corporation in New York State and owns and operates the hard rock salt mine at 191 Portland Point Rd., Lansing, New York, 14882. Defendant Cargill, Inc. is the named permittee for SPDES Permit No. 0101290.

17.    Plaintiff is informed and believes, and thereupon alleges, that Defendant Cargill Deicing Technology is the business entity within Cargill, Inc. which operates and manages the

day to day operations of the hard rock salt mine at 191 Portland Point Rd., Lansing, New York, 14882.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

18.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA Section 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

19.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States except in compliance with a NPDES permit issued under Section 402 of the Act.  33 U.S.C. § 1342.

20.     Section 402(p) of the Act establishes a framework for regulating stormwater pollution under the NPDES program, including stormwater discharges associated with industrial activity.  33 U.S.C. § 1342(p). Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

21.     In promulgating stormwater regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

22.     A NPDES permit requires dischargers of pollution to comply with various limitations and conditions, such as monitoring and reporting requirements.

23.     The CWA and its implementing regulations require dischargers to monitor and report any regulated pollution.  Under the CWA, whenever necessary to carry out the Act's objectives, owners or operators of point sources that discharge pollutants must "(i) establish and maintain such records, (ii) make such reports, (iii) install, use, and maintain such monitoring equipment or methods" and "(iv) sample such effluents" as EPA may reasonably require. 33 U.S.C. § 1318(a)(A). This self-monitoring and reporting by dischargers allow the government to determine, among other things, whether the discharger is in violation of effluent limitations applicable to the discharge. *See id.* § 1318(a).

24.     NPDES permits are issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  *See* 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

25.     In New York, DEC has been delegated the authority to issue NPDES permits. DEC has issued Defendants an individual SPDES permit for polluted point source discharges from the Facility.  A true and correct copy of Defendants' Permit is attached as Exhibit B and is incorporated by reference.

### CWA Citizen Enforcement Suits

26.     Under CWA Section 505(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.  33 U.S.C. § 1365(a)(1).

7

27.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  *See* CWA Section 505(f), 33 U.S.C. § 1365(f).

28.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

29.     Injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a).

30.     Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violation occurring after December 6, 2013, but before November 2, 2015, and $53,484 per day per violation for all violations of the Act occurring after November 2, 2015. *See* 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

### The Resource Conservation and Recovery Act

31.     Enacted in 1976, the declared purpose of RCRA is to prohibit the treatment, storage, and disposal of solid wastes in a manner that may present an imminent and substantial endangerment to human health or the environment. 42 U.S.C. § 6902(a).

32.     In Section 6901(b)(2), Congress specifically highlighted the potential danger to human health and the environment of solid waste disposal without careful planning and management. Id. at § 6901(b)(2).

33.     Accordingly, RCRA categorically prohibits the handling, transportation, and disposal of any "solid waste" in a manner that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. §6972(a).

34.     The term "solid waste" is defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities…."

Id. at § 6903(27).

### RCRA Citizen Enforcement Suits

35.     Under RCRA Section 7002(a)(1), any citizen may commence a civil action in federal court on her own behalf against any person who is alleged to be in violation of "any permit, standard, regulation, condition, requirement, prohibition, or order" under RCRA or "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1), (2).

36.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such declaration).

37.     Injunctive relief and civil penalties are authorized by Section 7002(a) of RCRA, 42 U.S.C. § 6972(a).

### V.

### STATEMENT OF FACTS

### Defendants' Salt Mine

38.     Defendants operate a hard rock salt mine at 191 Portland Point Rd., Lansing, New York, 14882.

39.     The Facility includes approximately 70 acres along the shoreline of Cayuga Lake. Defendants' subterranean mining activity spans 13,307 acres, at depths of up to 2,500 feet.  The Facility extends under Cayuga Lake, the Town of Lansing, and the Town of Ulysses.

40.     The Facility's above-ground operations include activities such as bagging, storage, handling, transporting by rail, and trucking of mined rock salt, and handling salt brine that is created through these other activities.  There is also a weigh station located uphill on Portland Point Road, above a stone quarry owned and operated by Cayuga Crushed Stone, Inc. located at 87 Portland Point Rd., Lansing, New York, 14882 (the "Quarry").  Defendants also own and operate two salt storage pads located towards the south end of the Quarry.

41.     The Facility contains conveyor belts used for moving and piling salt, three open-air bulk salt storage pads adjacent to Minnegar Brook on the north end of the Facility, two large building for salt processing and storage, as well as a variety of other structures.  The upper, middle, and lower bulk storage pads are about 162, 180, and 205 yards long, respectively.  To the far south end of the Facility is Gulf Creek.  Minnegar Brook and Gulf Creek are both tributaries to Lake Cayuga.

### Minnegar Brook

42.     Minnegar Brook is a direct tributary to Cayuga Lake that is wholly located in the Town of Lansing, Tompkins County, New York.  The brook drains approximately one square mile of the eastern slope along the lake.  The drainage area is about five miles north of the southern terminus of the lake.  The total watershed of Minnegar Brook encompasses nearly 540 feet of elevation and over 670 total acres.  Minnegar Brook is primarily divided between a north branch, a south branch, and a mainstem totalling 4.11 miles of stream.

43.      Approximately three acres of the Facility are located within the Minnegar watershed. The Facility's three outdoor bulk salt storage pads are located along the southern edge of Minnegar Brook's mainstem.

44.      Aerial photography shows noticeable decline in vegetation health downslope of the salt piles towards Minnegar Brook, visible evidence that salt pile leachate and run-off is migrating off site during rainfall events and that salt is landing on this area through aerial deposition.

45.      Additionally, runoff of salt spilled from loaded, outgoing truck traffic is a source of saline contamination of the brook.

46.      A preliminary study of benthic macroinvertebrates in Minnegar Brook shows that the Brook's ecology is already negatively influenced by salinity, including a shifting of the benthic invertebrate communities toward saline tolerant species and, quite remarkably, wholesale elimination of mayflies from the lower reaches of Minnegar Brook.

**Gulf Creek**

47.      Gulf Creek is a third order stream draining the eastern slope of the Cayuga-Owasco plateau.  Gulf Creek is a direct tributary of Cayuga Lake, entering the lake approximately 0.75 miles south of Minnegar Brook.  A culvert running under Portland Point Road ("Culvert 1") empties into Gulf Creek.  Culvert 1 is fed by a hillside ditch that drains saline runoff from the two salt pads at the Quarry.  The Facility's Permit does not authorize discharges of pollutants to Gulf Creek.

**Cayuga Lake and the Culverts**

48.      Cayuga Lake is classified as an AA(T) water by DEC and is designated and used as a drinking water supply.  In addition to Culvert 1, four additional drainage culverts under Portland Point Road collect and concentrate the flow of stormwater runoff from the landscape, as well as springs and streams in the vicinity of the Facility, in the process conveying pollution to Cayuga Lake

that originates from Defendants' activities.  From south to north, this complaint refers to these as Culverts 2-4.  These culverts drain portions of the landscape south of the Facility and downgradient of the Quarry – approximately the area where the Quarry's two salt pads are located.  A fifth, northernmost culvert, Culvert 5, concentrates discharges from a downhill area west of the Facility's three storage pads and discharges to Gulf Creek, which eventually flows into Cayuga Lake.  *See* Exhibit B.  None of these culverts are permitted outfalls.

### Defendants' SPDES Permit

49.     The Permit designates Cayuga Lake and groundwater as the only permitted receiving waters for discharges. Exhibit B at 1. The Permit designates eight outfalls from which Defendants may discharge water to Cayuga Lake. Six of these outfalls (001, 002, 003, 006, 007, and 012) are designated for the conveyance of runoff from bulk salt storage areas.  *Id*. at 3. Another outfall (009) discharges wastewater from the onsite sewage treatment plant, and outfall (014) discharges cooling water.  *Id*. at 3-4.

50.     The Permit requires Defendants to sample discharges from the bulk salt storage area and the sewage treatment plant on a monthly basis, at the designated outfalls.  *Id*. at 3. Defendants are required to test for Flow, Chlorides, Cyanides (Free), and Total Dissolved Solids at outfalls 001, 002, 003, 006, 007, 012, and for Total Zinc at outfall 001.  *Id*.  At outfall 009, Defendants are required to test for Flow, BOD5, Total Suspended Solids, Settleable Solids, pH, Chlorine Residual, and Fecal Coliform.  *Id*. at 3.

51.     The Facility's discharges are subject to strict numeric effluent limitations ("NELs").  It is a violation of the Permit, and thus the CWA, for the Facility's discharges to contain levels of pollution that are higher than the numeric effluent limitations.  Outfall 001 is subject to daily maximum NELs.  *Id*.  Daily maximum NELs set the limit for the highest

allowable amount of an effluent in a 24-hour period.  Outfalls 002, 003, 006, 007, and 012 are
subject to daily average NELs.  Daily average NELs set the limit for the highest allowable
geometric mean of daily discharges.  *Id*.  Outfall 009 is subject to daily maximum limits and 7-
day and 30-day average limits.  *Id*.

52.    Defendants are required to submit discharge monitoring reports ("DMRs"), which
document Defendants' compliance or non-compliance with the NELs and the sampling
mandates.  Defendants are required to submit DMRs monthly.  *Id*. at 10.  Defendants are also
required to submit an annual report to DEC.  *Id*.

53.    In addition, the Permit has a number of special conditions.

54.    Special Condition 1 of the Permit requires Defendants to develop a Best
Management Practices plan ("BMP Plan") "to prevent releases of significant amounts of
pollutants to the waters of the State through plant site runoff; spillage and leaks; sludge or waste
disposal; and stormwater discharges including, but not limited to, drainage from raw material
storage."  *Id*. at 5.

55.    Special Condition 2 of the Permit states that "the BMP plan shall be reviewed
annually and shall be modified whenever . . . actual releases indicate the plan is inadequate[.]"
*Id*.

56.    Special Condition 4 requires that the BMP plan at a minimum include 13 BMPs,
based on EPA's September 1992 manual on Storm Water Management for Industrial Activities,
including but not limited to those related to "Materials/Waste Handling, Storage, &
Compatibility" and "Management of Runoff."  *Id*. at 5.

57.    Special Condition 6 requires Defendants to develop a wet weather operating plan
and "conform to the approved wet weather operating plan (WWOP).  A revised WWOP must be

submitted whenever Cargill replaces or modifies their operation in a manner that impact flows to Cayuga Lake." *Id*. at 6.

58.     Finally, footnote 1 to the numeric effluent limitations for Outfall 001 contains another effluent limitation: it states that "Upper, Middle and Lower Salt Storage Pad Discharges must comply with Drainage Operations Manual - November 1994." *Id*. at 3.

59.     In addition to chloride and the major ions measured through total dissolved solids, discharges through outfalls 001, 002, 003, 006, 007, and 012 contain other pollutants: zinc, cyanide, ferrocyanide, iron, and pollutants related to the vehicles and industrial equipment used in the areas drained by these stormwater outfalls, such as oil & grease, chemical oxygen demand (i.e. various oxygen-demanding pollutants), benzene, ethylbenzene, toluene, and xylene.

60.     The pollutants released through the sewage treatment plant at outfall 009, in addition to those pollutants for which the Permit requires sampling, includes various substances commonly found in human sewage that are not removed by treatment plants.  These include a number of metals as well as pharmaceuticals and personal care products.

## Defendants Discharge Polluted Runoff to Minnegar Brook

61.     The Permit does not authorize the Facility to discharge pollutants to Minnegar Brook.  The Permit only allows discharges to Cayuga Lake and groundwater, and only through outfalls specifically designated in the Permit.

62.     However, unlawful discharges to Minnegar Brook of stormwater runoff associated with industrial activities – salt mining – take place regularly during precipitation events, i.e., when it rains or when snow melts.

63.     The three salt pads on the north end of the Facility, the salt conveyor belt system, and other structures, containers, and drainage devices at the Facility are point sources of

14

pollution. Although sometimes partially covered with waterproof tarpaulins, the pads are often exposed to precipitation.  During precipitation events, stormwater associated with industrial activities is discharged from the pads and conveyor and carries chlorides, sodium, free cyanide and other pollutants into Minnegar Brook.  Stormwater runoff travels over land and through erosion channels and ditches to Minnegar Brook, which is located just a short distance away.

64.     Stormwater runoff entering Minnegar Brook on the south bank, adjacent to Defendants' western-most salt storage pad, contains chloride levels nearly three times higher than the state surface water standard (250 mg/l).  Sampling also indicates a trend of increasing chloride and sodium values along a downstream continuum on Minnegar Brook.  Chloride and sodium values at a downstream sampling location (near the Railroad Crossing) were significantly higher than at an upstream sampling location (near NYS Route 34).  Further, aerial photography shows noticeable decline in vegetation health downslope of the salt pads towards Minnegar Brook, suggesting surface flow of saline runoff during rainfall events.

65.     Stormwater runoff from salt spilled from loaded, outgoing truck traffic is another point source of pollution to Minnegar Brook, and a likely contributor to high salinity levels detected in the Brook.  In particular, the weigh station on Portland Point Road is not included in the "Monitoring Locations" diagram in the Permit and no outfall is designated or associated with discharges of stormwater from the weigh station area.  Discharges of stormwater associated with industrial activity from the weigh station enter Minnegar Brook and Cayuga Lake in violation of the Permit.

66.     Examination of the biota of Minnegar Brook shows ecological impairment in the Brook that is accentuated in the Brook's lower reaches and that can be attributed to the elevated levels of salinity detected.

**Defendants Discharge Polluted Runoff to Cayuga Lake From Unpermitted Outfalls**

67.     Defendants discharge polluted stormwater runoff through Culverts 2, 3, 4 and 5, which drain to Cayuga Lake.  *See* Exhibit A, attachment A.  These discharges are unauthorized by the Permit.

68.     Culverts 2, 3 and 4 are located downhill of the Quarry's two salt piles and concentrate stormwater runoff from the two salt piles before discharging into Cayuga Lake. Stormwater discharged through Culverts 2-4 is stormwater associated with industrial activity and contains pollutants.  Samples taken at Culverts 2-4 showed high levels of chloride, in excess of the state surface water standard.

69.     Culvert 5 drains roughly two acres of land in the vicinity of the Facility's salt storage pads.  Sampling has shown that stormwater conveyed through Culvert 5 contains concentrations of chloride several fold higher than state surface water quality standards, as well as detectable concentrations of free cyanide.

**Defendants Discharge Unpermitted Wastes into Cayuga Lake**

70.     Publicly available satellite imagery from July 15, 2015 shows a tanker truck disgorging its contents onto the pavement at the southwest corner of the middle bulk salt storage pad slightly upgradient from what appears to be a drain for the collection of stormwater runoff. *See* Exhibit A, attachment B.

71.     The Permit authorizes the discharge of runoff from the salt storage pads. The Permit does not authorize the discharge of any process wastewater, vehicle washing wastes, waste streams associated with liquids transported on site by tanker trucks, or any other waste streams associated with the salt storage area beyond runoff.

**Defendants Discharge Polluted Runoff to Gulf Creek from an Unpermitted Outfall**

72.    Defendants discharge polluted stormwater associated with industrial activity through Culvert 1, into Gulf Creek.

73.    On the south end of the Quarry, Defendants maintain two bulk salt storage pads. Salt stored on these pads is regularly exposed to precipitation.

74.    The pads and their drainage structures are point sources of pollution.

75.    When it rains, stormwater carrying pollutants (e.g., chloride, sodium, free cyanide) migrates off site and reaches Gulf Creek via various routes including a hillside ditch that feeds into Culvert 1.

76.    Culvert 1 is also a point source.

77.    Sampling in Gulf Creek shows that portions of Gulf Creek downstream of the Quarry possess significantly higher chloride levels than upgradient background samples.

**Defendants' Discharges Exceed Numeric Effluent Limitations Set in the Permit for Chloride and Total Dissolved Solids (Outfalls 001, 002, 006)**

78.    Defendants repeatedly exceed the numeric effluent limits in their SPDES permit. Defendants have repeatedly discharged chloride and total dissolved solids at levels that exceed the numeric effluent limits established for Outfalls 001, 002, and 006.  Specific dates of exceedances, based on Defendants' self-monitoring and reporting, are set forth in the table depicted in Exhibit A.  *See* Exhibit A at 12.

79.    As the table shows, Defendants reported to DEC that they have discharged excessive levels of chlorides and dissolved solids through their stormwater outfalls on numerous occasions since 2009.

80.    Exceedances likely occur more frequently than is reflected in the Facility's DMRs because the DMRs are based on grab samples that are taken once per month and do not reveal the effluent levels in every discharge.

17

81.     Additional monitoring of the discharge from Outfall 002 was conducted for several weeks in July 2015.  Although the level of chloride in the monthly grab sample collected by Defendants in July 2015 was 1,400 mg/L, the additional monitoring showed that the discharge from outfall 002 exceeded the 10,000 mg/L chloride effluent limit in the permit on three dates in that month: July 21, 25, and 26.  Publicly available weather records indicate that a rain event occurred on each of these days.

82.     On this basis, Plaintiff believes and alleges that more frequent or continuous monitoring covering more storm events would likely show more regular exceedances of chloride and dissolved solid limits than those reported in Defendants' DMRs.

**Defendants Are Not Implementing Best Management Practices for Stormwater Control**

83.     The discharge of highly saline runoff with excess levels of chloride and dissolved solids from the stormwater outfalls (001, 002, 003, 006, 007, and 012), coupled with equally polluted discharges from numerous unpermitted and unauthorized points demonstrates that Defendants are not using best management practices ("BMP"s) to control stormwater pollution.

84.     Special Condition 1 of the Permit requires Defendants to develop and adhere to an adequate BMP plan, while Special Condition 2 requires Defendants to modify that plan when "actual releases indicate the plan is inadequate." *See* Exhibit B.

85.     The high chloride and other pollutants levels in releases to Cayuga Lake, Minnegar Brook and Gulf Creek show that the best management practices in place are inadequate and that spills of salt and leaks of polluted water regularly enter Minnegar Brook, Gulf Creek, and Cayuga Lake.

86.     Defendants' BMPs and other pollution prevention measures have not been revised to stop spills and leaks and bring discharges under control.

87. Plants and grasses downslope of the salt storage pads and on other areas at the Facility have turned brown.

88. The browning or "burnout" of vegetation in areas around the Facility indicates vegetation morbidity or mortality.

89. These physical impacts on the terrain surrounding the Facility demonstrate clearly and visibly that Defendants have not complied with Special Conditions 1 and 2 of the Permit.

90. Similarly, the discharge of salt, brine, and polluted stormwater from the three salt pads to Minnegar Brook cannot comply with the Drainage Operations Manual.  Nor can the Wet Weather Operating Plan allow for discharges of pollution to Minnegar Brook and Gulf Creek. Defendants' wet weather operating practices and drainage practices, like their BMPs, do not meet the requirements set forth in the Permit (Special Condition 6 and footnote 1 to the numeric effluent limitations for Outfall 001).

91. Defendants violate the above-listed effluent limitations during every rain event in which Defendants discharge pollution from unauthorized points and/or the discharges from permitted outfalls exceed numeric effluent limitations.

92. Further, because Special Condition 2 imposes an affirmative duty on Defendants to update and implement their BMP plan whenever actual releases demonstrate that the plan is inadequate to reduce stormwater pollution to permitted levels, Defendants have violated Special Condition 2 on every day upon which they have failed to improve their BMPs to an adequate level since actual releases from the Facility (and their effect of burning out vegetation) first made it obvious that stormwater discharges were not adequately controlled.

**Discharges from Defendants' Sewage Treatment Plant Exceed Numeric Effluent
Limitations in the SPDES Permit (Outfall 009)**

93.     Discharges from Defendants' sewage treatment plant regularly exceed the
numeric effluent limits for sewage discharges established in the Permit.  Specific dates of
exceedances are set forth in the table depicted in Exhibit A.  Exhibit A at 14-15.

94.     The technology-based effluent limits established for Defendants' sewage
treatment plant in the Permit are designed such that, if the plant is well-run, it should be able to
discharge effluent below these limits. The recurrent exceedances at the sewage treatment plant
demonstrate that there is an underlying and ongoing problem with the equipment, staff training,
and/or operational practices of the plant that needs to be investigated and remedied.

95.     Plaintiff has reviewed state permitting records and did not find reports of non-
compliance events that explain the causes of these recurrent violations.

96.     Further, Plaintiff's review did not suggest that these problems have been
permanently resolved, even though Defendant added a septic system to the Facility in 2017,
since violations have continued thereafter.

97.     Defendants' failure to maintain and operate its sewage treatment plant in a
manner that ensures compliance with permit limits at all times is itself a violation of the permit.

98.     The permit incorporates by reference, as "effluent limitations" within the meaning
of the federal Clean Water Act, the provisions of New York's SPDES regulations codified at 6
NYCRR Part 750-2.8.[1]

---

[1] See Permit p.1 of 10. (providing that Cargill "is authorized to discharge . . . in accordance with: effluent
limitations; monitoring and reporting requirements; other provisions and conditions set forth this permit;
and 6 NYCRR Part 750-1.2(a) and 750-2); *see also* 33 U.S.C. §1365(f) ("For purposes of this section, the

99.     Part 750-2.8(a)(2) provides that "[t]he permittee shall, at all times, properly operate and maintain all disposal facilities, which are installed or used by the permittee to achieve compliance with the conditions of the permit."

100.     Further, Part 750-2.8(a)(5) requires that "[t]he permittee and operator shall operate the wastewater treatment facility in such a manner as to minimize the discharge of pollutants to a degree that is achievable when compared to standard practices for operation of such wastewater treatment facilities."

101.     Defendants do not properly operate and maintain their disposal facility, nor do they minimize the discharge of pollutants to a degree achievable compared to standard practices at other, well-run wastewater treatment facilities.

**Defendants are Discharging Salt via Aerial Deposition Without a Permit**

102.     Defendants discharge salt to Minnegar Brook, Gulf Creek, and Cayuga Lake through aerial deposition in violation of the Clean Water Act.

103.     The Facility's salt pads are partially uncovered and exposed to the elements.  In addition, Defendants' process for moving salt using conveyors and other equipment results in salt blowing off conveyors, being dropped onto storage pads and salt piles from above, and during these and other processes some salt is blown offsite by the wind.  In certain wind conditions, salt is carried offsite, from the salt piles and elsewhere at the Facility, and deposited in Minnegar Brook, Gulf Creek, Cayuga Lake and their surrounding watersheds.

---

term "effluent standard or limitation under this chapter" means . . . (4) a [NPDES] permit or condition thereof…").

104.    The Permit does not authorize the Facility to discharge salt, or any other pollutant, to Minnegar Brook.

105.    Aerial deposition of salt is contributing to the high levels of chlorides sampled in the lower reaches of Minnegar Brook, as well as the ecological impairment that has been observed.

106.    The Permit does not authorize the Facility to discharge salt, or any other pollutant, to Gulf Creek.

107.    Sampling on the lower reaches of Gulf Creek, south of the Facility, shows high levels of chloride in excess of background levels.

108.    Discharges of salt to Cayuga Lake are authorized only through permitted, numerically limited outfalls, and not through aerial deposition.


## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants to Minnegar Brook
### (Violation of 33 U.S.C. §§ 1311 and 1342)

109.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

110.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges that are not in compliance with a valid NPDES or SPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

111.    During precipitation events, Defendants discharge stormwater associated with industrial activity to Minnegar Brook from numerous outfalls that are not authorized by the Permit.

112.    By discharging stormwater from these outfalls, Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States that are not authorized under their SPDES permit. Accordingly, these discharges are not "in compliance with" Sections 301 and 402 of the CWA.

113.    Each and every day on which Defendants discharge stormwater associated with industrial activity in violation of the terms of their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

114.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

115.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Unlawful Discharge of Pollutants to Gulf Creek
### (Violation of 33 U.S.C. §§ 1311 and 1342)

116.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

117.    During precipitation events, Defendants discharge stormwater associated with industrial activity to Gulf Creek from Culvert 1, an outfall that is not authorized by the Permit.

118.    By discharging stormwater from this outfall, Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States that are not authorized under their SPDES permit. Accordingly, these discharges are not "in compliance with" Sections 301 and 402 of the CWA.

119.     Each and every day on which Defendants discharge stormwater associated with industrial activity in violation of the terms of their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

120.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

121.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

**Unlawful Discharge of Pollutants to Cayuga Lake
(Violation of 33 U.S.C. §§ 1311 and 1342)**

122.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

123.     During precipitation events, Defendants discharge stormwater associated with industrial activity to Cayuga Lake from Culverts 2, 3, 4 and 5, outfalls that are not authorized by the Permit.

124.     By discharging stormwater from these outfalls, Defendants have discharged and continue to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States that are not authorized under their SPDES permit. Accordingly, these discharges are not "in compliance with" Sections 301 and 402 of the CWA.

125.     Each and every day on which Defendants discharge stormwater associated with industrial activity in violation of the terms of their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

126.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

127.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Unlawful Discharge of Pollutants – Unauthorized Waste Streams
### (Violation of 33 U.S.C. §§ 1311 and 1342)

128.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

129.     Publicly available satellite imagery from July 15, 2015 shows a tanker truck discharging a waste stream into a drain designated for the collection of stormwater runoff.

130.     Each and every day on which Defendants discharge any process wastewater, vehicle washing wastes, waste streams associated with liquids transported on site by tanker trucks, or any other waste streams associated with the salt storage area beyond runoff in violation of the terms of their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

131.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

132.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## FIFTH CAUSE OF ACTION

### Unlawful Discharge of Pollutants – Aerial Deposition
### (Violation of 33 U.S.C. §§ 1311 and 1342)

133.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

134.    Defendants unlawfully discharge salt to Minnegar Brook, Gulf Creek, and Cayuga Lake through aerial deposition in violation of the Clean Water Act.

135.    Each and every day on which Defendants discharge salt through aerial deposition in violation of the terms of their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

136.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

137.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION

**Violations of Numeric Effluent Limits at Outfalls 001, 002, and 006**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

138.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

139.    Defendants have repeatedly discharged chloride and total dissolved solids at levels that exceed the numeric effluent limits established in the Permit for Outfalls 001, 002, and 006.

140.    Each and every day on which Defendants exceed the numeric effluent limits in their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

141.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

142.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

26

## SEVENTH CAUSE OF ACTION

**Ongoing Exceedance of the Numeric Effluent Limits in the Permit – Outfall 009**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

143.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

144.    Discharges from Defendants' sewage treatment plant, released through Outfall 009, regularly exceed the numeric effluent limits established for that outfall in the Permit.

145.    Defendants' failure to maintain and operate its sewage treatment plant in a manner that ensures compliance with permit limits at all times is itself a violation of the Permit.

146.    Each and every day on which Defendants exceed the numeric effluent limits in their SPDES permit is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

147.    Each and every day on which Defendants fail to properly maintain and operate the sewage treatment plant is a separate and distinct violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

148.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

149.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## EIGHTH CAUSE OF ACTION

**Violations of the Non-Numeric Effluent Limits in the Permit**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

150.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

151.    Defendants have failed to comply with Special Conditions 1 and 2, the Drainage Operations Manual, and the Wet Weather Operating Plan, in violation of the Permit and the Act. *See* 33 U.S.C. §§ 1311.

152.    Each and every day on which Defendants fail to comply with these Permit conditions is a separate and distinct violation of the Permit and Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342.

153.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

154.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## NINTH CAUSE OF ACTION

### Imminent and Substantial Endangerment to Health or the Environment
### (Violation of RCRA, 42 U.S.C. § 6972(a)(1)(B))

155.    Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

156.    Under RCRA Section 7002(a)(1), any citizen may commence a civil action in federal court on her own behalf against any person who is alleged to be in violation of "any permit, standard, regulation, condition, requirement, prohibition, or order" under RCRA or "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1), (2).

157.    Through their spilling, depositing, discharging or dumping salt and salt brine, Defendants have contributed to the handling, transportation, and disposal of a solid waste that

28

may present an imminent and substantial endangerment to health or the environment, in violation

of RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).

158.    Each and every day on which Defendants handle, transport, and dispose of a solid

waste that may present an imminent and substantial endangerment to health or the environment

is a separate and distinct violation of RCRA, 42 U.S.C. § 6972(a)(1)(B).

159.    Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain,

speedy, or adequate remedy at law.

160.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

161.    Plaintiff OCE respectfully requests that this Court grant the following relief:

a.      Declare Defendants to have violated and to be in violation of the CWA and

RCRA as alleged herein;

b.       Enjoin Defendants from discharging pollutants from the Facility except as

authorized by and in compliance with their SPDES permit;

c.      Order Defendants to take appropriate actions to remediate the harm caused by the

violations of the CWA and RCRA, to the extent possible;

d.      Order Defendants to pay, jointly and severally, civil penalties of $37,500 per day

per violation for all violations of the CWA occurring before November 2, 2015 and up to

$52,414 per day per violation for all violations of the Act occurring after November 2, 2015, as

provided by Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and by

40 C.F.R. §§ 19.1 – 19.4;

e.      Order Defendants to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorneys' fees, witness and consultant fees, and other costs, in accordance with Section 505(d) of the CWA, 33 U.S.C. § 1365(d) and Section 7002(e) of RCRA, 42 U.S.C. § 6972(e); and

f.      Award any such other and further relief as this Court may deem appropriate.

Dated this 15th day of August 2019          Respectfully submitted,
New York, New York


                                            By:  s/ Edan Rotenberg

                                            Edan Rotenberg

                                            SUPER LAW GROUP, LLC
                                            180 Maiden Lane, Suite 603
                                            New York, NY 10038
                                            Tel. (212) 242-2355
                                            edan@superlawgroup.com

                                            *Attorney for Plaintiff*